**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| WELCH FOODS INC., A COOPERATIVE )<br><br>Plaintiff, )<br><br>v. )<br><br><br>ZURICH AMERICAN INSURANCE )<br>COMPANY; NATIONAL UNION FIRE )<br>INSURANCE CO. OF PITTSBURGH, PA.; )<br>and AXIS SURPLUS INSURANCE )<br>COMPANY )<br><br>Defendants. ) | CIVIL ACTION NO. 09-12087 |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT,
BREACH OF CONTRACT, AND BREACH OF M.G.L. c. 176D & c. 93A**

Plaintiff, Welch Foods Inc., A Cooperative ("Welch"), by and through its undersigned attorneys, complain and move for judgment against defendants, and respectfully alleges as follows:

**NATURE OF ACTION AND RELIEF SOUGHT**

1.     This is an action for declaratory judgment, for breach of contract, and for relief based upon insurer's unfair claim settlement practices and unfair and deceptive acts and practices in handling Welch's claim under M.G.L. c. 176D, § 3(9) and M.G.L. c. 93A, §§ 2, 11, including treble damages pursuant to M.G.L. c. 93A, §§ 2, 11, as amended by Chapter 580 of the Acts of 1989. Plaintiff seeks:

(a)     a declaration of the obligations of defendant insurance companies, under insurance policies sold either to Welch or to its parent company, National Grape Cooperative

Association, Inc. ("National Grape"), to defend and/or pay the cost of defending two separate lawsuits alleging, among other claims, that Welch misrepresents on its labeling and other advertisements that the primary ingredients of its Welch's 100% Juice White Grape Pomegranate Flavored 3 Juice Blend juice is white grape and pomegranate juice, while the actual primary ingredients, according to plaintiffs in these lawsuits, are white grape and apple juice, but with little or no pomegranate juice;

(b)     a declaration of the obligations of defendant insurance companies, under insurance policies sold to Welch or to National Grape, to indemnify Welch with respect to the two lawsuits referenced above;

(c)     compensatory damages against defendant insurance companies for breaching their contractual duty to defend Welch and/or pay its defense costs pursuant to their insurance policies, along with prejudgment interest, attorneys' fees and costs;

(d)     damages and other relief based upon the defendant insurance company's unfair claim settlement practices and unfair and deceptive acts and practices in handling Welch's claim under M.G.L. c. 176D, § 3(9) and M.G.L. c. 93A, §§ 2, 11, including treble damages pursuant to M.G.L. c. 93A, §§ 2, 11, as amended by Chapter 580 of the Acts of 1989; and

(e)     such other and further relief as the Court may deem just and proper.

## IDENTITY OF PARTIES

2.     Plaintiff Welch is a corporation organized and existing under the laws of Michigan, with its principal place of business in Middlesex County in the Commonwealth of Massachusetts.

3.     Plaintiff Welch is a wholly-owned subsidiary of National Grape.

4.     Upon information and belief, Defendant Zurich American Insurance Company ("Zurich American") is a New York corporation with its principal place of business in

Schaumburg, Illinois.   Zurich American is licensed to do and does business in the Commonwealth of Massachusetts.

5.      Upon information and belief, Defendant National Union Fire Insurance Company of Pittsburgh, PA is a member of the American International Group, Inc.  National Union Fire Insurance Company of Pittsburgh, PA ("AIG') is a Pennsylvania corporation with its principal place of business in New York, New York.  National Union is licensed to do and does business in the Commonwealth of Massachusetts.

6.      Upon information and belief, Defendant AXIS Surplus Insurance Company ("AXIS") is an Illinois corporation with its principal place of business in Alpharetta, Georgia.  AXIS is licensed to do and does business in the Commonwealth of Massachusetts.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.      Moreover, the Court has jurisdiction pursuant to the Declaratory Judgment Act, 8 U.S.C.  §  2201, 2202 and Fed.R.Civ.P. 57 because an actual controversy exists between plaintiff and defendant insurance companies regarding whether insurance policies issued by defendant insurance companies provide defense and indemnity to Welch for the two underlying lawsuits.

9.      This Court has personal jurisdiction over each named defendant because each named defendant, or its subsidiary is (1) qualified to do business as a foreign corporation in Massachusetts;  (2) has transacted business in Massachusetts;  (3) has contracted to supply services or goods in Massachusetts;  (4) has contracted to insure persons, property and risks located within Massachusetts at the time of contracting; (5) has solicited, procured, effected, and negotiated for insurance in Massachusetts; (6) has made, issued, and delivered contracts of insurance in Massachusetts; (7) has collected and received premiums and other consideration for

insurance in Massachusetts; and (8) has disseminated information as to coverage and rates, forwarded applications, inspected risks, fixed rates, investigated and adjusted claims and losses, and transacted all other matters relating to and arising from effecting contracts of insurance in Massachusetts.

## VENUE

10.     Venue of this action in the District of Massachusetts is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this judicial district and each named defendant insurance company is subject to personal jurisdiction in this judicial district.

## THE POLICIES

A.     The Zurich American Policy

11.     Zurich American sold a commercial general liability insurance policy (policy number GLO 8445677-08) to Welch covering the period September 1, 2008 through September 1, 2009 (hereinafter, the "Zurich American Policy").  A true and correct copy of policy number GLO 8445677-08 is attached to the Complaint filed December 8, 2009 (Docket # 1) ("Original Complaint") as Exhibit A.

12.     The Zurich American Policy provides "personal and advertising injury liability" coverage.  The "personal and advertising injury liability" insuring agreement obligates Zurich American to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies."

13.     The "personal and advertising injury liability" insuring agreement further provides that Zurich American "will have the right and duty to defend the insured against any 'suit' seeking [those] damages."

14.     The Zurich American Policy defines "personal and advertising injury," as follows:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a.      False arrest, detention or imprisonment;

b.      Malicious prosecution;

c.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d.      Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.      Oral or written publication, in any manner, of material that violates a person's right of privacy;

f.      The use of another's advertising idea in your advertisement; or

g.      Infringing upon another's copyright, trade dress or slogan in your advertisement.

15.     The Zurich American Policy defines "Advertisement," as follows:

"Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purpose of this definition:

a.      Notices that are published include material placed on the Internet, or on similar electronic means of communication; and

b.      Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purpose of attracting customers or supporters is considered an advertisement.

16.     The Zurich American Policy defines "Occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

17.     Welch paid all required insurance premiums with respect to the Zurich American Policy and has satisfied all terms and conditions of those policies.

18.     The Zurich American Policy was in full force and effect at all pertinent times.

B.      The AIG Policy

19.     AIG sold a not-for-profit individual and organizational insurance policy (policy number 01-223-68-01) to Welch covering the period September 1, 2008 through September 1, 2009 (hereinafter, the "AIG Policy").  A true and correct copy of policy number 01-223-68-01 is attached to the Original Complaint as Exhibit B.

20.     The AIG Policy provides three types of coverage, Coverage A (Individual Insured Insurance), Coverage B (Organizational Indemnification Reimbursement Insurance), and Coverage C (Organizational Entity Coverage).

21.     The AIG Policy defines Coverage C or the "Organizational Entity Coverage Insuring Agreement," as follows:

> This policy shall pay on behalf of the Organization Loss arising from a Claim first made against the Organization during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of the Organization.  The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

22.     The AIG Policy defines "Wrongful Act," as follows:

> (1)     with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in his/her respective capacities as such, or any matter claimed against such Individual Insured solely by reason of his/her status as Individual Insureds of the Organization;

> (2)     with respect to the Organization under Coverage C, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the Organization;

> . . .

> (4)     with respect to both the Individual Insureds and the Organization and subject to paragraphs 1, 2, and 3 above, 'Wrongful Act' shall specifically include: . . (c) violation of the Sherman Antitrust Act or similar federal, state or local statutes or rules; (d) libel, slander, defamation or publication or utterance in violation of an

individual's right of privacy; . . . and (h) infringement of copyright or trademark or unauthorized use of title.

23.     The AIG Policy defines "Claim" to include "a civil criminal, regulatory or administrative proceeding for monetary or non-monetary relief which is commenced by . . . service of a complaint or similar pleading."

24.     The AIG Policy defines "Defense Costs" to include "reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Individual Insureds."

25.     The AIG Policy defines "Subsidiary" to include "any organization which, on or before the inception of the Policy Period the Organization owns more than fifty percent (50%) of the voting interest, either directly, or indirectly through one or more of its Subsidiaries, or has, on or before the inception of the Policy Period, the right to elect or appoint more than fifty percent (50%) of the voting directors, or trustees, either directly or indirectly through one or more of its Subsidiaries."

26.     Welch paid all required insurance premiums with respect to the AIG Policy and has satisfied all terms and conditions of those policies.

27.     The AIG Policy was in full force and effect at all pertinent times.

C.     The AXIS Policies

28.     AXIS sold a media perils and professional errors and omissions liability insurance policy (policy number EGN711111/01/2006) to Welch covering the period September 1, 2006 through September 1, 2007 (the "2006 AXIS Policy").  A true and correct copy of policy number EGN711111/01/2006 is attached hereto as Exhibit R.

29.     AXIS sold a second media perils and professional errors and omissions liability insurance policy (policy number EGN711111/01/2007) to Welch covering the period September 1, 2007 through September 1, 2008 (the "2007 AXIS Policy").  A true and correct copy of policy number EGN711111/01/2007 is attached hereto as Exhibit S.

30.     AXIS sold a third media perils and professional errors and omissions liability insurance policy (policy number EGN711111/01/2008) to Welch covering the period September 1, 2008 through September 1, 2009 (the "2008 AXIS Policy").  A true and correct copy of policy number EGN711111/01/2008 is attached hereto as Exhibit T.

31.     In virtually all material respects, the three above-mentioned media perils and professional errors and omissions liability insurance policies issued by AXIS to Welch (collectively, the "AXIS Policies") contain identical terms and conditions.  Each AXIS policy provides two types of coverage, Coverage A (Media Wrongful Act Coverage) and Coverage B (Professional Services Wrongful Act Coverage).  Coverage A is written on an "occurrence" basis, and Coverage B is written on a "claims made" basis.

32.     The "Media Wrongful Act Coverage," provides, as follows:

If Insuring Agreement A is selected in the Declarations, the Insurer shall pay on behalf of any Insured all Loss arising from any Claim for a Media Wrongful Act, provided that such Media Wrongful Act occurred during the Policy Period.

33.     The AXIS Policies define "Media Wrongful Act(s)," as follows:

Media Wrongful Act(s) means any actual or alleged act, error or omission when committed or allegedly committed by an Insured in his, her or its capacity as such, in connection with the creation or dissemination of the Covered Media, or in connection with the creation or dissemination of Advertising Material relating to the Covered Media, including but not limited to the following:

1.     invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light, or misappropriation of name or likeness;

2.     wrongful entry or eviction, trespass, eavesdropping, or other invasion of the right of private occupancy;

3.      libel, slander, disparagement, or any other form of defamation or harm to the character or reputation of any person or entity;

4.      outrage, infliction of emotional distress or prima facie tort;

5.      infringement or dilution of trademark, trade name, trade dress, title, slogan, service mark or service name;

6.      copyright infringement, plagiarism, piracy, breach of implied contract, or misappropriation of property rights, information or ideas;

7.      breach of a promise of confidentiality or anonymity;

8.      error or omission in Content;

9.      unfair competition or conspiracy, but only when the allegation of unfair competition or conspiracy is based upon one or more Media Wrongful Acts falling within sections 1-8 above; or

10.     breach of an indemnification or hold harmless agreement relating to claims arising out of the Covered Media, but only when such claims allege a Media Wrongful Act within sections 1-9 above.

34.     The "Professional Services Wrongful Act Coverage," provides, as follows:

If Insuring Agreement B is selected in the Declarations, the Insurer shall pay on behalf of any Insured all Loss arising from any Claim first made against such Insured during the Policy Period or, if applicable, Extended Reporting Period, and reported to the Insurer in writing as soon as practicable but no later than sixty (60) days after the expiration of the Policy Period or, if applicable, Extended Reporting Period, for a Professional Services Wrongful Act committed on or after the Prior Acts Date set forth in Item 7 of the Declarations and before the expiration of the Policy Period.

35.     The AXIS Policies define "Professional Services" to mean "only services that are . . . identified in Item 6 of the Declarations, including any such services that are performed electronically using the Internet or a network of two or more computers."

36.     Item 6 of the Declarations states: "Professional Services: Promotional and marketing services."

- 9 -

37.     The AXIS Policies define "Covered Media" to mean "the Content of the publications, programs, films, broadcasts, internet sites or other material identified in Item 5 of the Declarations, including any electronic or digital versions of any of the foregoing."

38.     Item 5 of the Declarations states: "Covered Media: All content produced or disseminated by the Insured and all content on company owned websites."

39.     The AXIS Policies define "Advertising Material" to mean "Content advertising, publicizing or promoting the products or services of the Policyholder or of any third party, including but not limited to (1) any print, broadcast, electronic or digital materials, and (2) the Content of any internet web page created or maintained by any Insured."

40.     The AXIS Policies define "Content" as follows:

> Content means any communicative material (including but not limited to words, pictures, sounds, images, and graphics), regardless of the mode or method of communication of such material (including but not limited to print, broadcast, digital and electronic communication); provided, however, that Content does not include software, computer code, computer programs, computer systems, or any technology or device whose function is the delivery of such Content.

41.     The AXIS Policies define "Loss" to mean "the amount(s) which the Insureds become legally obligated to pay on account of a Claim, including compensatory damages, punitive and exemplary damages (where insurable by law), judgments, any award of pre-judgment or post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments, and Defense Costs."

42.     The AXIS Policies define "Claim(s)" to include "a civil, arbitration, administrative, investigative or regulatory proceeding against any Insured commenced by . . . the service of a complaint or similar pleading."

43.     The AXIS Policies define "Policy Period" to mean "the period of time specified in Item 2 of the Declarations, subject to prior termination in accordance with Section VIII. C."

44.     Welch paid all required insurance premiums with respect to the AXIS Policies and has satisfied all terms and conditions of those policies.

45.     The AXIS Policies were in full force and effect at all pertinent times.

46.     AXIS, Zurich American, and AIG are collectively referred to hereinafter as the "Insurers."

47.     The AXIS Policies, the Zurich American Policy, and the AIG Policy are collectively referred to hereinafter as the "Policies."

## THE UNDERLYING LAWSUITS

A.     The POM Litigation

48.     On or about January 23, 2009, POM Wonderful LLC ("POM") filed a complaint captioned *POM Wonderful LLC v. Welch Foods Inc.*, CV09-00567 in the United States District Court for the Central District of California based on Welch's alleged misrepresentations on its labeling and other advertisements that the primary ingredients of its Welch's 100% Juice White Grape Pomegranate Flavored 3 Juice Blend (hereinafter, "WGPom") juice is white grape and pomegranate juice, while the actual primary ingredients, according to plaintiff , are white grape and apple juice (hereinafter, the "*POM* Complaint").   A true and correct copy of the *POM* Complaint, without exhibits, is attached to the Original Complaint as Exhibit C.

49.     The *POM* Complaint alleges that "[n]otwithstanding that Welch's product actually contains little or no pomegranate juice, both in advertising and on the bottle itself, Welch's characterizes this product as "White Grape & Pomegranate" juice, and includes a prominent depiction of pomegranates in the forefront of its label when, in fact, the primary ingredients are actually white grape and apple juice."  (*POM* Complaint, ¶ 20)

50.     In fact, Welch's WGPom juice is a blend of white grape, apple, and pomegranate juice (in order by volume).  The naming of Welch's White Grape Pomegranate juice and the visual depictions on its label are done in compliance with FDA regulations that govern the naming and labeling of juice products.

51.     The *POM* Complaint alleges that "[i]n addition to the claims on the product itself, Welch maintains a website at www.welchs.com that advertises and markets" the allegedly misleading WGPom juice.  Further, the *POM* Complaint alleges that "Welch's has engaged in other forms of marketing and advertising of its White Grape Pomegranate Product targeting consumers throughout the United States."  (*POM* Complaint, ¶ 21)

52.     The *POM* Complaint alleges that "by characterizing [WGPom juice] as 'White Grape & Pomegranate' and including prominent display of pomegranates on the label and packaging, Welch's has confused and misled consumers, who reasonably expect that the primary ingredients are white grape and pomegranate juice."  (*POM* Complaint, ¶ 20)

53.     The *POM* Complaint alleges that Welch's "false and misleading representations are designed to entice consumers to purchase Welch's product over Plaintiff's products.  Specifically, Welch's false and misleading representations regarding the primary ingredients of its product imply that its product is of the same composition and quality of blended pomegranate juices such as Plaintiff's blended pomegranate juices . . . ."  (*POM* Complaint, ¶ 23)

54.     The *POM* Complaint alleges that "Welch's suggestive marketing, which includes a prominent depiction of pomegranates in the forefront of the label, on the packaging, and in connection with advertising, leads consumers to believe that White Grape Pomegranate Product is an antioxidant-rich juice product, containing all of the health benefits associated with Plaintiff's products, when in fact it does not." (*POM* Complaint, ¶ 23)

55.     The *POM* Complaint alleges that the "result of Welch's wrongful conduct has been to cause confusion, deception and mistake in the pomegranate juice market as a whole, to deprive Plaintiff of business and goodwill, and to injure Plaintiff's relationships with existing and prospective customers."  (*POM* Complaint, ¶ 25)

56.     The *POM* Complaint alleges that "Welch's false and misleading advertising of its White Grape Pomegranate Product is damaging to the reputation and good will of plaintiff and is damaging to the consuming public."  (*POM* Complaint, ¶ 23)

B.      The Burcham Class Action Litigation

57.     On or about August 14, 2009, Maryam Burcham, on behalf of herself and all other similarly situated plaintiffs, filed a consumer class action lawsuit captioned *Maryam Burcham v. Welch Foods Inc.*, CV09-05946 in the United States District Court for the Central District of California against Welch based on the allegations that consumers over-paid for Welch's WGPom juice because the labeling led them to believe that they were buying pomegranate juice (hereinafter, the "*Burcham* Complaint").   A true and correct copy of the *Burcham* Complaint, without exhibits, is attached to the Original Complaint as Exhibit D.

58.     The *Burcham* Complaint alleges that Welch "has made, and continues to make, misrepresentations and/or omissions regarding its White Grape Pomegranate Juice.  Specifically, the White Grape Pomegranate Juice which has been packaged, advertised, marketed and sold by Welch's based on the label and other forms of advertising to Plaintiff, and others similarly situated, represented that the primary ingredients in the juice product are white grape and pomegranate juice." (*Burcham* Complaint, ¶ 2)

59.     The *Burcham* Complaint alleges that "[b]y characterizing this product as 'White Grape Pomegranate,' and including the prominent display of pomegranates on the front and back label, Welch's misled Plaintiff and other consumers, who reasonably expect that a significant quantity of the product contains pomegranate juice." (*Burcham* Complaint, ¶ 20)

60.     The *Burcham* Complaint alleges that the plaintiff in her purchasing decision relied upon Welch's "labeling, packaging, advertising and/or other promotional materials which were prepared and approved by Defendant and its agent and disseminated through its packaging, advertising, and marketing, and/or through local and national advertising media, including Defendant's Internet web-sites, media and in-store advertisements, containing the misrepresentation and/or omissions." (*Burcham* Complaint, ¶ 11)

61.     The *Burcham* Complaint alleges that Welch's WGPom juice "purports to combine white grape and pomegranate, into a single juice product.  However, the truth is that the main ingredients in Defendant's White Grape Pomegranate Juice are actually cheap white grape and

apple juice, instead of pomegranate juice, which is one of nature's most potent antioxidants." (*Burcham* Complaint, ¶ 17)

62.     The *Burcham* Complaint alleges that "despite the fact that white grape and apple juice are the predominant juices in its product, Defendant decided to give this juice product the brand name of 'White Grape Pomegranate' juice on the label, and to predominantly display a picture of pomegranates in the forefront, among other misleading elements." (*Burcham* Complaint, ¶ 18)

63.     The *Burcham* Complaint alleges that "Welch's leads consumers to believe that one of the primary ingredients in the product is pomegranate juice, when in fact the product primarily contains cheap juice fillers, such as white grape and apple juice." (*Burcham* Complaint, ¶ 27)

64.     The *Burcham* Complaint alleges that as a result, "Plaintiff and members of the Class have purchased the White Grape Pomegranate Juice under the false impression that a significant quantity of the product contains pomegranate juice." (*Burcham* Complaint, ¶ 3)

65.     The *POM* Complaint and the *Burcham* Complaint are, hereinafter, collectively referred to as the "Underlying Lawsuits."

## THE COVERAGE DISPUTE

66.     Welch timely tendered the *POM* Complaint and the *Burcham* Complaint to its Insurers for coverage.

67.     Two of the insurers, Zurich American and AIG, denied their obligations to defend and indemnify Welch for the allegations of either the *POM* Complaint or the *Burcham* Complaint.  The third insurer, AXIS, denied coverage under two of its policies, but agreed to defend the *POM* Complaint under a third policy, while reserving its rights.

A.      Zurich American's Denial of Coverage for the *POM* Complaint

68.      On March 16, 2009, one of Welch's insurance brokers, Marsh, on Welch's behalf, telephonically provided notice to Zurich American regarding the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit E.

69.      On or about March 16, 2009, Zurich American sent a letter to Welch indicating that its notice regarding the *POM* Complaint had been received.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit E.

70.      On or about May 1, 2009, Zurich American sent a letter to Welch denying its duty to defend and indemnify Welch in connection with the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit F.

71.      On or about August 25, 2009, Welch's counsel sent a letter to Zurich American requesting coverage and explaining that all the requirements of a covered claim under the Zurich American Policy are met by the allegations of the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit G.

72.      On or about September 17, 2009, Zurich American sent a letter to Welch maintaining its denial of the duty to defend and indemnify Welch in connection with the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit H.

73.      As a result of Zurich American's improper denial of coverage, Welch has been forced to undertake and pay for portions of its own defense of the *POM* Complaint since its inception.  At the time of this complaint, Welch's reasonable defense costs for the *POM* Complaint exceed $75,000.

74.      Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *POM* Complaint.  This dispute cannot be resolved absent relief from this Court.

B.      AIG's Denial of Coverage for the *POM* Complaint

75.      On or about February 5, 2009, one of Welch's insurance brokers, Wells Fargo, on Welch's behalf, provided notice to AIG regarding the *POM* Complaint and requested that AIG defend and indemnify Welch under its insurance policy.   A true and correct copy of this communication is attached to the Original Complaint as Exhibit I.

76.      On or about February 6, 2009, AIG sent a letter to Welch indicating that its notice regarding the *POM* Complaint had been received.   A true and correct copy of this communication is attached to the Original Complaint as Exhibit J.

77.      On or about March 31, 2009, AIG sent a letter to Welch denying its duty to defend and indemnify Welch in connection with the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit K.

78.      On or about August 25, 2009, Welch's counsel sent a letter to AIG requesting coverage and explaining that all the requirements of a covered claim under the AIG Policy are met by the allegations of the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit L.

79.      On or about October 8, 2009, AIG sent a letter to Welch maintaining its denial of the duty to defend and indemnify Welch in connection with the *POM* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit M.

80.      As a result of AIG's improper denial of coverage, Welch has been forced to undertake and pay for portions of its own defense of the *POM* Complaint since its inception.  At the time of this complaint, Welch's reasonable defense costs for the *POM* Complaint exceed $75,000.

81.      Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *POM* Complaint.  This dispute cannot be resolved absent relief from this Court.

C.      AXIS's Coverage of the *POM* Complaint Under a Reservation of Rights

82.     On or about February 5, 2009, one of Welch's insurance brokers, Wells Fargo, on Welch's behalf, provided notice to AXIS regarding the *POM* Complaint and requested that AXIS defend and indemnify Welch under its insurance policies.   A true and correct copy of this communication is attached hereto as Exhibit U.

83.     On or about March 5, 2009, AXIS wrote to Welch stating that it disclaimed "any duty to defend or coverage for Defense Costs and any associated indemnity based on the allegations in the Pom Complaint under the 2006 Policy and the 2007 Policy."   A true and correct copy of this communication is attached hereto as Exhibit V.

84.     In its March 5, 2009 letter, AXIS accepted Welch's "tender of defense under the 2008 Policy pursuant to a reservation of rights."   The March 5, 2009 letter reserved AXIS's rights to disclaim coverage for the Pom Complaint under the Media Wrongful Act coverage and the Professional Services Wrongful Act coverage of the AXIS Policies.

85.     Thereafter, on or about August 5, 2009, AXIS wrote to Welch, supplementing its preliminary coverage determination.   AXIS stated that "AXIS will reimburse Welch's for the reasonable and necessary costs it incurs defending the Pom Complaint subject to the reservation of rights set forth in the Reservation of Rights Letter and this letter."   In addition, the August 5, 2009 correspondence conditioned AXIS's payment of the defense costs for the *POM* Complaint on the right to seek reimbursement from Welch "for the defense of claims which are determined not to be covered under the AXIS Policies."   A true and correct copy of this communication is attached hereto as Exhibit W.

86.     On or about March 25, 2009, AXIS filed a complaint captioned *AXIS Surplus Ins. Co. v. Welch Foods Inc. et al.*, 1:09-cv-10454-JLT in this Court seeking a declaration that it had no duty to defend or indemnify Welch in connection with the *POM* Complaint (hereinafter, the "AXIS Coverage Action").   A true and correct copy of the complaint in the AXIS Coverage Action, without exhibits, is attached hereto as Exhibit X.

87.     AXIS Policies obligated the parties to submit their dispute regarding insurance coverage to arbitration or mediation before commencing coverage litigation.

88.     In accordance with the terms of the AXIS Policies, the parties entered into mediation to resolve their coverage dispute regarding AXIS's obligations to defend and indemnify Welch for the allegations of the *POM* Complaint.

89.     In accordance with the terms of the AXIS Policies, on or about September 9, 2009, the AXIS Coverage Action was dismissed without prejudice pursuant to Fed. R. Civ. P. 41(a).

90.     Despite efforts to resolve this coverage dispute through mediation, the parties have not been able to reach a negotiated resolution.  Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *POM* Complaint.  This dispute cannot be resolved absent relief from this Court.

D.     Zurich American's Denial of Coverage for the *Burcham* Complaint

91.     On or about August 18, 2009, Welch provided notice to Zurich American regarding the *Burcham* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit N.

92.     On or about August 18, 2009, Zurich American sent a letter to Welch indicating that its notice regarding the *Burcham* Complaint had been received.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit N.

93.     On or about October 21, 2009, Zurich American sent a letter to Welch denying its duty to defend and indemnify Welch in connection with the *Burcham* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit O.

94.     Because of Zurich American's improper denial of coverage, Welch has been forced to undertake and pay for portions of its own defense of the *Burcham* Complaint since its

inception.  At the time of this complaint, Welch's reasonable defense costs for the *Burcham* Complaint exceed $75,000.

95.     Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *Burcham* Complaint.  This dispute cannot be resolved absent relief from this Court.

E.      AIG's Denial of Coverage for the *Burcham* Complaint

96.     On or about August 19, 2009, one of Welch's insurance brokers, Wells Fargo, on Welch's behalf, provided notice to AIG regarding the *Burcham* Complaint and requested that AIG defend and indemnify Welch under its insurance policy.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit P.

97.     On or about August 19, 2009, AIG sent a two-line e-mail to Wells Fargo denying its duty to defend and indemnify Welch in connection with the *Burcham* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit P.

98.     On or about December 1, 2009, AIG sent a letter to Welch denying its duty to defend and indemnify Welch in connection with the *Burcham* Complaint.  A true and correct copy of this communication is attached to the Original Complaint as Exhibit Q.

99.     Because of AIG's improper denial of coverage, Welch has been forced to undertake and pay for portions of its own defense of the *Burcham* Complaint since its inception.  At the time of this complaint, Welch's reasonable defense costs for the *Burcham* Complaint exceed $75,000.

100.    Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *Burcham* Complaint.  This dispute cannot be resolved absent relief from this Court.

F.      AXIS's Coverage of the *Burcham* Complaint Under a Reservation of Rights

101.    On or about August 18, 2009, Welch provided notice to AXIS regarding the *Burcham* Complaint.  A true and correct copy of this communication is attached hereto as Exhibit Y.

102.    On or about August 18, 2009, AXIS sent a letter to Welch indicating that notice regarding the *Burcham* Complaint had been received.  A true and correct copy of this communication is attached hereto as Exhibit Y.

103.    AXIS did not respond in writing to Welch's notice of the *Burcham* Complaint. The coverage of the *Burcham* Complaint was, however, included in the parties' mediation to resolve their coverage dispute regarding AXIS's obligations to defend and indemnify Welch for the allegations of the *POM* Complaint.

104.    Despite efforts to resolve this coverage dispute through mediation, the parties have not been able to reach a negotiated resolution.  Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the payment of past and future attorneys' fees and costs incurred in defense of the allegations of the *Burcham* Complaint.  This dispute cannot be resolved absent relief from this Court.

G.      Dispute Regarding AXIS's Reimbursement of Reasonable Attorney's Fees Incurred to Defend the Underlying Lawsuits

105.    On or about July 22, 2009 AXIS approved the retention of the law firm of Jones Day, led by Rick L. Shackelford in its Los Angeles office, for defending the Underlying Lawsuits.  An email confirming the July 22, 2009 discussion between Edward Shin of Welch and Scott Swift of AXIS is attached as Exhibit Z.

106.    On or about July 22, 2009, in reliance on AXIS's approval of Jones Day and Rick Shackelford, Welch hired Rick L. Shackelford to defend the Underlying Lawsuits and Jones Day began incurring fees and costs at that time.

107.    AXIS did not seek or obtain agreement from Welch that it would reimburse only a portion of the defense expenses incurred by Jones Day or Rick L. Shackelford.

108.    Rick L. Shackelford has since moved to the law firm of Greenburg Traurig, LLP and continues to represent Welch in the Underlying Lawsuits.

109.    On or about November 16, 2009, AXIS sent Welch a check that included reimbursement for Jones Day invoice no. 32139960 for the defense of the Underlying Lawsuits. A true and correct copy of the communication accompanying the check is attached hereto as Exhibit AA.

110.    The Jones Day invoice no. 32139960 totaled $70,690.15, yet AXIS reimbursed only $36,512.15, leaving $34,178, *i.e.*, 48.3% of the defense costs, unpaid.  A true and correct copy of the correspondence from AXIS's counsel to Welch's counsel dated November 17, 2009 is attached hereto as Exhibit AB.

111.    The majority of the reductions to Jones Day invoice no. 32139960 (*i.e.*, $21,275 out of $34,178) are due to AXIS's reduction of Jones Day's partner hourly billing rates, which range from $625 to $675, down to $450 per hour.

112.    Neither Welch nor its counsel agreed to the reduced hourly billing rates for defending the Underlying Lawsuits.  Welch learned for the first time that AXIS unilaterally decided on an hourly billing rate of $450 per hour when it received AXIS's payment for the first Jones Day invoice on November 16, 2009.

113.    Counsel's hourly billing rates for the defense of the Underlying Lawsuits are reasonable given the fees usually charged for defending complex intellectual property and class action litigation by similarly-qualified professionals in California.

114.    Because of AXIS's improper unilateral reduction of the hourly billing rates for counsel defending the Underlying Lawsuits, Welch has been forced to undertake and pay for nearly half of its defense costs for the Underlying Lawsuits.

115.    Therefore, a genuine and real dispute in excess of $75,000 exists between the parties concerning the reimbursement of past and future attorneys' fees and costs incurred in

defense of the Underlying Lawsuits.  This dispute cannot be resolved absent relief from this Court.

## COUNT ONE:
## DECLARATORY RELIEF– DUTY TO DEFEND –
## AGAINST ZURICH AMERICAN AND AIG ONLY

116.   Welch repeats each and every allegation contained in paragraphs 1 through 115 as if fully set forth herein.

117.   Welch has incurred and will continue to incur significant expenses in defense and resolution of the *POM* and *Burcham* Complaints.

118.   The *POM* and *Burcham* Complaints assert multiple allegations that, if proven to be true, would legally obligate Welch to pay damages as a result of covered "Wrongful Act," as the term is defined in the AIG Policy.

119.   The *POM* and *Burcham* Complaints assert multiple allegations that, if proven to be true, would legally obligate Welch to pay damages as a result of covered "personal and advertising injury," as the term is defined in the Zurich American Policy.

120.   Welch vigorously contests the factual and legal bases of the allegations in the *POM* and *Burcham* Complaints.

121.   Despite the groundless nature of the *POM* and *Burcham* Complaints, AIG and Zurich American are obligated pursuant to the insurance policies they issued to defend Welch and to pay all costs and expenses that Welch incurs in the defense of those claims.

122.   AIG and Zurich American have breached their insurance policies by denying coverage and refusing to honor their obligations to defend Welch under their Policies.

123.   As a direct and proximate result of the breach of contract by AIG and Zurich American, Welch has incurred, and will continue to incur, substantial costs and expenses in the investigation and defense of the *POM* and *Burcham* Complaints and has suffered, and will continue to suffer, other direct and consequential damages.

124.    An actual, justiciable controversy exists between plaintiff and defendants AIG and Zurich American regarding the proper interpretation of the insurance policies.

125.    Welch is therefore entitled to a declaration that AIG and Zurich American are obligated under the policies they issued to honor their defense obligation to Welch and to pay Welch's defense costs in connection with the *POM* and *Burcham* Complaints, including attorneys' fees, costs, and other expenses reasonably incurred in defending and investigating those Complaints.

**COUNT TWO:**
**DECLARATORY RELIEF– DUTY TO DEFEND – AGAINST AXIS ONLY**

126.    Welch repeats each and every allegation contained in paragraphs 1 through 115 as if fully set forth herein.

127.    Welch has incurred and will continue to incur significant expenses in defense and resolution of the *POM* and *Burcham* Complaints.

128.    The *POM* and *Burcham* Complaints assert multiple allegations that, if proven to be true, would legally obligate Welch, to pay damages as a result of covered "Media Wrongful Act" as the term is defined in the 2006 AXIS Policy and the 2007 AXIS Policy.

129.    The *POM* and *Burcham* Complaints assert multiple allegations that, if proven to be true, would legally obligate Welch, to pay damages as a result of covered "Media Wrongful Act" and covered "Professional Services Wrongful Act" as the terms are defined in the 2008 AXIS Policy.

130.    Welch vigorously contests the factual and legal bases of the allegations in the *POM* and *Burcham* Complaints.

131.    Despite the groundless nature of the *POM* and *Burcham* Complaints, AXIS is obligated pursuant to the policies it issued to defend Welch and to pay all costs and expenses that Welch incurs in the defense of those claims.

132.     AXIS has breached the 2006 AXIS Policy and the 2007 AXIS Policy by denying coverage and refusing to honor its obligations to defend Welch under these Policies.

133.     Further, AXIS has breached the 2008 AXIS Policy by refusing to pay the entire reasonable and necessary costs and expenses incurred by Welch in the defense of the *POM* and *Burcham* Complaints.

134.     As a direct and proximate result of AXIS's breach of contract, Welch has incurred, and will continue to incur, substantial costs and expenses in the investigation and defense of the *POM* and *Burcham* Complaints and has suffered, and will continue to suffer, other direct and consequential damages.

135.     An actual, justiciable controversy exists between Welch and AXIS regarding the proper interpretation of the AXIS Policies.

136.     Welch is therefore entitled to a declaration that AXIS is obligated under the AXIS Policies to honor its defense obligation to Welch and to pay Welch's defense costs in connection with the *POM* and *Burcham* Complaints, including attorneys' fees, costs, and other expenses reasonably incurred in defending and investigating those Complaints.

**COUNT THREE:**
**BREACH OF CONTRACT – DUTY TO DEFEND – AGAINST ALL INSURERS**

137.     Welch repeats each and every allegation contained in paragraphs 1 through 136 as if fully set forth herein.

138.     The Insurers' failure or refusal to respond in accordance with their contractual obligations to Welch's demands for reimbursement of defense costs incurred in connection with the *POM* and *Burcham* Complaints constitutes a breach of each of the Policies issued by the Insurers.

139.     As a direct and proximate result of the Insurers' breach of their Policies, Welch has been deprived of the benefit of insurance coverage for which it paid significant premiums.

140.     AIG and Zurich American have not reimbursed Welch for any of its expenses or costs incurred in defending the *POM* and *Burcham* Complaints, claims that fall within the coverage of the AIG Policy and the Zurich Policy.

141.     AXIS has not reimbursed Welch for the entire reasonable and necessary costs and expenses that incurred by Welch in the defense of the *POM* and *Burcham* Complaints, claims that fall within the coverage of the AXIS Policies.

142.     As a direct and proximate result of the Insurers' breach of their contracts of insurance, Welch has suffered monetary damages and will continue to incur additional amounts on a daily basis.

## COUNT FOUR:
## UNFAIR AND DECEPTIVE ACTS AND PRACTICES
## IN VIOLATION OF M.G.L. c. 176D AND c. 93A – AGAINST AXIS ONLY

143.     Welch repeats each and every allegation contained in paragraphs 1 through 142 as if fully set forth herein.

144.     At all relevant times, Welch and AXIS have engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§ 2 and 11.

145.     In the handling of Welch's claim for reimbursement of expenses incurred to defend the Underlying Lawsuits, AXIS has engaged in unfair claim settlement practices without justification and demonstrated bad faith by compelling Welch to institute this litigation and to incur substantial costs to recover amounts under the AXIS Policies, by offering substantially less than an amount substantially equivalent to the sum to which Welch is entitled under the AXIS Policies.

146.     The acts and practices engaged in by AXIS in its handling of Welch's claim for coverage with respect to the *POM* and *Burcham* Complaints constitute unfair and deceptive acts and practices within the meaning of M.G.L. c. 93A, §§ 2 and 11, and unfair claim settlement practices within the meaning of M.G.L. c. 176D, § 3(9).

147.     Because of AXIS's unfair and deceptive acts and practices and unfair claim settlement practices, Welch has suffered, and continues to suffer, damages in an amount to be proved at trial.

148.     AXIS's unfair and deceptive acts and practices and unfair claim settlement practices are willful or knowing violations of M.G.L. c. 93A, §§ 2 and 11 and M.G.L. c. 176D, § 3(9), respectively.

## COUNT FIVE:
## DECLARATORY RELIEF– DUTY TO INDEMNIFY – AGAINST ALL INSURERS

149.     Welch repeats each and every allegation contained in paragraphs 1 through 148 as if fully set forth herein.

150.     The *POM* and *Burcham* Complaints assert multiple allegations that, if proven to be true, fall within the coverage provided by the Policies.

151.     Zurich American and AIG assert that they do not have an obligation to indemnify Welch for the claims asserted against Welch in the *POM* Complaint and the *Burcham* Complaint.

152.     AXIS asserts that it does not have an obligation to indemnify Welch for the claims asserted against Welch in the *POM* Complaint under the 2006 AXIS Policy and the 2007 AXIS Policy.

153.     AXIS asserts that it has a right to disclaim coverage for the claims asserted against Welch in the *POM* Complaint under the 2008 AXIS Policy.

154.     The Insurers' failure or refusal to respond in accordance with their contractual obligations to Welch's demands for indemnity in connection with the *POM* and *Burcham* Complaints constitutes a breach of each of the Policies issued by the Insurers.

155.     As a direct and proximate result of the Insurers' breach of their Policies, Welch has been deprived of the benefit of insurance coverage for which it paid significant premiums.

156.     An actual, justiciable controversy exists between Welch and the Insurers regarding the proper interpretation of the Policies.

157.    Welch is therefore entitled to a declaration that the Insurers are obligated under the Policies to honor their obligation to indemnify Welch in connection with the *POM* and *Burcham* Complaints.

## PRAYER FOR RELIEF

WHEREFORE, Welch respectfully requests that this Court enter judgment in its favor as follows:

158.    On its FIRST CLAIM, a declaratory judgment that Zurich American and AIG are obligated under the Zurich Policy and AIG policy, respectively, to defend Welch with respect to the *POM* and *Burcham* Complaints.

159.    On its SECOND CLAIM, a declaratory judgment that AXIS is obligated under the AXIS Policies to defend Welch with respect to the *POM* and *Burcham* Complaints.

160.    On its THIRD CLAIM, compensatory damages against the Insurers in an amount that proof will establish for breach of the Insurers' Policies.

161.    On its FOURTH CLAIM, compensatory damages, punitive damages, and other relief against AXIS for violation of Chapters 176D and 93A:

    a.    for money damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

    b.    statutory punitive, treble damages equal to three times the amount of Welch's actual damages, as determined in accordance with Chapter 580 of the Acts of 1989;

    c.    for costs of suit;

    d.    for counsel fees; and

    e.    for such other and further relief as the Court may deem just and proper.

162.    On its FIFTH CLAIM, a declaratory judgment that the Insurers are obligated under the Policies to indemnify Welch with respect to the *POM* and *Burcham* Complaints.

163.    On all claims for relief, for attorneys' fees and costs for bringing this action, pre-judgment and post-judgment interest, and such other or further relief that this Court deems appropriate.

### **JURY TRIAL DEMAND**

Welch hereby demands a jury trial on all issues so triable.

Date: December 18, 2009

Respectfully submitted,

Welch Foods Inc., A Cooperative


By:  */s/ Shaun M. Gehan*
      Shaun M. Gehan, BBO#654268
      KELLEY DRYE & WARREN LLP
      3050 K Street, NW, Suite 400
      Washington, DC  20007-5108
      Telephone: (202) 342-8400
      Facsimile:  (202) 342-8451
      sgehan@kelleydrye.com

      Of Counsel:

      Richard D. Milone
      S. Mahmood Ahmad
      KELLEY DRYE & WARREN LLP
      3050 K Street, NW, Suite 400
      Washington, DC  20007-5108
      Telephone: (202) 342-8400
      Facsimile:  (202) 342-8451
      rmilone@kelleydrye.com
      mahmad@kelleydrye.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and attachments thereto, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the following by First Class Mail:

For Zurich American Insurance Company:

Stephen J. Abarbanel
Robinson & Cole LLP
One Boston Place
25th Floor
Boston, MA  02108-4404

and

For National Union Fire Insurance Company of Pittsburgh, PA:

Ivan J. Dolowich
Kaufman Dolowich Voluck & Gonzo LLP
135 Crossways Park Drive, Suite 201
Woodbury, NY  11797

/s/ Shaun M. Gehan
Shaun M. Gehan, BBO#654268
KELLEY DRYE & WARREN LLP
3050 K Street, NW, Suite 400
Washington, DC  20007-5108
Telephone: (202) 342-8400
Facsimile:  (202) 342-8451
sgehan@kelleydrye.com

*Counsel for Plaintiff Welch Foods Inc., A Cooperative*